# **EXHIBIT 2**

2 Berkery Place
Alpine, NJ
07620-0398

201-750-8220

## CHARLES V. WETLI, MD
### *FORENSIC PATHOLOGIST*

*CharlesVWetli@gmamil.com*

21 November 2016

Mr. Christian Bojorquez, Esq.
Mr. Craig J. Miller, Esq.
City Attorney Office
City Hall East
200 N. Main Street, Room 600
Los Angeles, CA 90012

Re: Mears v. City of Los Angeles (CV15-08441 JAK{AWJx})

Dear Mr. Bojorquez and Mr. Miller:

Regarding the death of Mr. Michael Mears, the following items were reviewed:

    Complaints for Damages
    Force Investigation Division Report No. F003-15
    Pre-Hospital Care Report
    Medical Records of Admission of 12/24/14
    VA Hospital Records
    Autopsy and Toxicology Reports
    Photographs of Scene and Autopsy
    Transcribed Interviews of Desteuben, Beumer, Pedroza, Gan, Seffel,
        Gist, Lew, Perez, Montes, Arteaga, Guzman, Wilkins, Jeter,
        Campbell, Butts, Rogers, McCracken, Petrich, Garrett, Greenfield,
        Kelly, Joseph, Ortega, Lehman, Lewis, Walker, Turner, Lovelacelee,
        Daley, Jackson, Haile, Kaur, Nat, Joshi, Shah, Robinson-Ashe, Reid,
        Johnson, Fagan, Rico, and Powers
    Depositions of Lew, Wilkins, Pedroza, Gist and Beumer

Michael Mears was a 39 year old Marine Corps Veteran with PTSD and a spinal cord injury from which he had recovered. One evening, his girl-friend was just getting out of the shower when she heard him screaming from the bedroom that someone was out to get him. He ran from the apartment and continued yelling and screaming, breaking glass (including glass cases for fire extinguishers, windows, light fixtures, etc.). Apartment security was called and a guard contained him in a hallway where he rolled around in broken glass. Both EMS and police subsequently responded. Their plan was to restrain

him as soon as possible so he could be transported to a hospital. After about 40 minutes the police resorted to the discharge of electrical conductive weapons (TASER), baton strikes and pepper spray until he was finally handcuffed and hobbled. He was placed on a gurney, given midazolam (a powerful and fast acting tranquilizer and sedative), and transported to a hospital. The midazolam had some effect but upon arrival at the hospital he again became violent and combative with yelling and screaming. He was found to have rhabdomyolysis (breakdown of skeletal muscle), hyperkalemia, hypoglycemia, hyperthermia, elevated creatinine, elevated CPK (creatine phosphokinase, a measure of skeletal muscle breakdown) and lactic acidosis. About 45 minutes after admission he had a cardiac arrest (pulseless electrical activity, where there is residual electrical activity of the heart which is nonetheless not beating). He was resuscitated but died the following day. At autopsy he had a 640 gram heart (enlarged, the normal for his height should be 345 grams) with biventricular hypertrophy and mild chamber dilatation. Toxicological analysis of a small sample of hospital blood (without any preservative) revealed a concentration of benzoylecgonine (a metabolite of cocaine) of 2.2mcg/ml. At issue is the cause of death and whether the actions of the police caused or contributed to his death.

In this case the police employed multiple discharges from a conducted electrical weapon (TASER), applied pepper spray and utilized baton strikes all in the attempt to subdue him. The autopsy excluded any injury that would have caused or contributed to his death. Pepper spray is a mucosal irritant that causes a burning sensation of the eyes, nose and mouth, and may induce coughing. However, the droplets are too large to be inhaled into the lungs to cause respiratory embarrassment. Furthermore, he had no problems breathing after the pepper spray was deployed and he was not incapacitated by its application.

It has been alleged that the application of conducted electrical weapons may interfere with the electrical activity of the heart. However, unlike most forms of man-made electricity, the electrical pathway is between two electrodes embedded in the skin. The electrical pathway totally bypasses the heart. Should there be any interference with the conduction system of the heart one would expect a fatal cardiac rhythm (ventricular fibrillation) to occur within 15 seconds of the discharge. This clearly did not occur to Mr. Mears who continued to struggle and be combative long after the last TASER discharge.

Mr. Mears had the classic signs and symptoms of a syndrome known as excited delirium. This is usually precipitated by the ingestion of stimulant or hallucinogenic drugs, although it may also be associated with certain infections and mental conditions as well. Typically, the individual loses realistic appreciation of the immediate environment, exhibits paranoid delusions and becomes violent toward various objects, especially glass. They exhibit unexpected strength and endurance and are impervious to pain control techniques (including applications of pepper spray, baton strikes and conducted electrical weapons). Loss of vital signs occurs suddenly after being restrained (i.e. after cessation of violent physical activity). Should they be resuscitated, death occurs with a few days from multi-organ failure. The syndrome is associated with elevated core body temperatures, and chemical indicia of skeletal muscle breakdown and kidney failure. The blood pH drops to very low levels because of the build up of lactic acid in the blood. The cardiac rhythm associated with the sudden loss of vital signs is invariably pulseless electrical

activity (PEA, as in this case) or asystole. Mr. Mears had all these signs and symptoms. Toxicological analysis of an unpreserved sample of hospital blood revealed a high level of a metabolite of cocaine. Usually, toxicological testing on a preserved sample of blood reveals a high level of cocaine metabolite and a low level of parent cocaine. In this case no cocaine was detected since the blood sample was unpreserved and because cocaine spontaneously breaks down to its metabolite in the test tube.

It is therefore my opinion to a degree of reasonable medical certainty that Mr. Michael Mears died from cocaine-induced excited delirium and that the actions of the police (including applications of baton strikes, pepper spray, and conducted electrical weapons) did not cause or contribute to his death.

Yours Truly,

*[signature]*
Charles V. Wetli, MD