# EXHIBIT 3

November 19, 2016

Christian Bojorquez
Los Angeles City Attorney's Office
Police Litigation Unit
200 N. Main St., Room 600 City Hall East
Los Angeles, CA 90012

Re: Mears v. City of Los Angeles

Dear Mr. Bojorquez,

Enclosed is a report of my findings in the above matter. In consideration of my opinions, I have reviewed the following materials:

Autopsy Report of Michael Mears
Complaints
FID report and supplement
Photographs
Medical records (UCLA, VA)
Depositions (Beumer, Gist, Lew, Pedroza, Wilkins)

I have also relied upon my clinical and research experience as a board-certified Medical Toxicologist and Emergency Physician, and a thorough review of the medical literature. My conclusions from this review are the following:

1. On December 24, 2014, around 1941, Michael Mears and Ingrid Lehman were in their apartment preparing for dinner. As Lehman exited the shower that evening, she heard Mears screaming "They are coming to get me!" She ran in to the bedroom to see what was wrong and found Mears paranoid and seemingly hiding from something in the room. Mears then ran out of the apartment into the hallway. Lehman initially went into the hallway with Mears and observed him acting strangely, making odd noises as if he were in a fight, and continuing to scream. Lehman went back into the apartment and called the building security guards after she locked her apartment door.
2. Darrell Garrett answered Lehman's call and was told Mears was "going through an episode" and needed medical attention. Garrett walked from the guard house to the building where Mears and Lehman were and walked up the stairs. Upon reaching the

1

third-floor, Garrett heard Mears yelling. Garrett looked into the third floor hallway and observed glass covering the floor from broken hallway light fixtures. Garrett reportedly witnessed Mears jumping up and down, banging his head against the wall and continuing to scream. Garrett closed the hallway door when Mears approached him fearing he would be attacked. By report, Mears then slammed his body against the hallway door repeatedly as Garrett held it closed.

3. Another resident of the complex called the apartment security office around 1950 to complain about the noise, stating that Mears was in the hallway banging his head against the walls and breaking lights. Security guard John Greenfield then also responded to the scene. Greenfield observed Garrett holding the door to the hallway shut out of concern the Mears would attack him. Greenfield then held the door closed while Garrett called "911" at 1957.

4. Paramedics arrived at the apartment complex around 2011. They observed Mears rolling around on the floor on the broken glass. Mears was covered with his blood. Paramedics believed Mears was under the influence of narcotics and were concerned about approaching him due to his behavior. Police officers also responded to the complex and met the medics, firefighters and security guards on the third floor. Fire department personnel requested help from the officers in restraining Mears so they could administer him medical care. Mears was continuing to roll around on the floor in the glass covered in blood, screaming and shouting incoherently. He was also violently thrashing his body back and forth the on the floor, slamming his body against the hallway walls. The officers and medics devised a plan to handcuff Mears so medics could administer medical care.

5. One of the officers opened the hallway door and instructed Mears to lie on the floor as they approached. He was initially unresponsive, but continued to thrash about on the floor. Mears then became more quiet and became still. The officers and medics approached Mears on each side. When they got within a foot of Mears, he "came to life" and kicked his legs toward one of the officers. In response, one of the officers drew his baton and struck Mears around his knee. The officer also administered a spray from his OC canister at Mears' face. The officers then backed away and waited for backup.

6. Other officers soon arrived at the scene. All observed Mears continuing to roll around on the glass and slam his body against the walls of the hallway while screaming. The group of officers then approached Mears again while ordering him to stop what he was doing and put his hands behind his back or he would be tasered. Mears apparently did not comply with officer orders. An officer deployed a taser dart and shock to Mears but it seemed to have no effect. After a second and third tasers shocks were applied, Mears rolled onto his stomach. The officers moved in and held him down while trying to handcuff him but Mears continued to struggle and they were unsuccessful in securing him. Further taser shocks and struggle with police ensued. Officers then applied a

2

      hobble restraint device to Mears, rolled him over, sat him up and placed him onto a gurney.

7. Medics then administered an injection of the sedative midazolam (Versed) to try to calm down Mears, and began their medical assessment. Medics then transported Mears to UCLA Medical Center Emergency Department (ED).

8. On arrival at UCLA, Mears was hyperthermic (elevated body temperature), tachycardic (elevated heart rate), and tachypneic (elevated breathing rate). His glucose was quite low, his blood acidic (low pH, metabolic acidosis), and his pupils were dilated. He also had a high potassium of 7.2, an elevated lactic acid, an elevated creatinine (decreased kidney function), and an elevated CPK (creatine kinase). Mears remained agitated and combative in the UCLA ED requiring restraints and was administered medical care. He suddenly went into cardiac arrest about 45 minutes after arrival to the ED, was resuscitated, but continued to deteriorate and finally could not be resuscitated from cardiac arrest again on the third hospital day.

9. An autopsy was performed on Mr. Mears and the coroner determined his cause of death to be "ventricular dysrhythmia," because of "cardiac enlargement with biventricular hypertrophy and four chamber dilatation." Another contributing factor according to the coroner was "cocaine intoxication." He had multiple abrasions, bruises and lacerations on his body. Toxicology analysis at autopsy on blood drawn while at the hospital showed a high benzoylecgonine (metabolite of cocaine) level of 2.2 ug/mL, taken from a purple top tube drawn from him on December 24, 2014. Cocaine was not detected from that blood sample due to its continued metabolism while sitting in the purple top tube before being tested at autopsy. The coroner added that the behavior and clinical signs of the decedent "have many features of the excited delirium syndrome." The presence of benzoylecgonine in Mr. Mears' blood at the time of his death at the concentrations measured, his laboratory results and hospital course at UCLA Medical Center, and his behavior witnessed by multiple persons on the evening of his interaction with security guards, police and firefighters make it medically probable that Michael Mears was under the influence of and intoxicated by cocaine at the time of his struggle with police and medics, leading to his hospitalization at UCLA Medical Center and eventually leading to his death.

10. Cocaine is a dangerous drug. It can be taken into the body by smoking, injection, or consuming it by mouth. Its effects on the body include toxicity to most every organ, but its activity on the brain and heart are the most important. In recreational use of cocaine, a person can feel initial euphoria and "disinhibition." They can also be more aggressive, and become violent and paranoid more easily. Users describe feeling more energy and strength. Cocaine is often used today along with other stimulants such as methamphetamine during rave parties and other events to allow wild dancing or activity for prolonged periods of time without rest. A person's heart rate, blood pressure, and respiratory rate often go up under the influence of these drugs. Users describe being able

3

to go hours without drinking and days without eating or sleeping as long as they are high on cocaine, and their judgment is often impaired.

11. Use of cocaine can lead to hallucinations, seizures, coma, irregular heartbeats, and death, both in "toxic" and "recreational" levels within the body. Recreational use of cocaine and similar stimulant drugs like methamphetamine and PCP can also lead to a condition called "toxic psychosis," or "excited delirium." This condition can occur in any user of these drugs and at any time while under the influence of the drug no matter what dose has been consumed. For reasons not completely understood, users who develop excited delirium display unpredictable agitation while under the influence – they do not have to overdose in order to get this reaction. When an individual enters an excited delirium state, they are often quite violent, threatening potential harm to either themselves or bystanders. In this condition, these individuals may appear to possess superhuman strength or pain tolerance, likely the result of their brains not recognizing pain in the same fashion as when not intoxicated with these drugs. At times, they will commit suicide in this situation (such as running onto a freeway), and others have committed homicide. Many times, they develop violent agitated behavior, abnormal vital signs including heart rate and blood pressure, and often, dangerously elevated body temperatures, especially when the drug state is combined with a struggle during an exertional situation like running or fighting. However, individuals intoxicated with or under the influence of cocaine and other stimulants that do not display "excited delirium" can still become violent, behave irrationally and combatively and use poor judgment while under the influence of or intoxicated by these drugs. For example, individuals under the influence of these drugs will often resist arrest by police, even when confronted by multiple police officers brandishing service weapons and other devices such as Tasers. They can also develop multiple organ injury in the body from the effects of cocaine without excited delirium.

12. During this excited delirium or even in a state of cocaine toxicity, subjects are at risk for chemical or electrolyte disorders or even sudden death. The most common electrolyte or chemical abnormalities in patients with excited delirium or cocaine intoxication states and extreme struggles or agitation are elevations in potassium, and increased acidity of the blood (i.e. "metabolic acidosis"), and elevations of creatine kinase (CPK, a protein released from muscle cells during states of exercise, drug toxicity and other disorders). These electrolyte or chemical disorders can lead to irregular heart rhythms and failure of organs such as the kidneys. Many times these chemical disorders can result in lethal heart rhythms and other potentially life-threatening conditions that can occur in police custody, on the way to the hospital while being cared for by medics, or in the emergency department. Mr. Mears' laboratory examinations and vital signs when he arrived at UCLA displayed the hyperthermia and all chemical disorders noted above.

4

Based on my knowledge of this case and the disciplines of Medical Toxicology and Emergency Medicine, I believe it is medically probable that Michael Mears was under the influence of and intoxicated by cocaine at the time of his struggle with police and medics on December 24, 2014, and this contributed to or led to his bizarre, agitated and violent behavior with police officers and medics. It is medically probable that the influence of this drug contributed to his confrontation with officers and his body's chemical imbalances and contributed to his death.

I reserve my right to amend this report based on plaintiff expert reports or testimony or forthcoming depositions or evidence.

Please let me know if you have any questions.

Sincerely,

*[signature]*
Richard F. Clark, M.D.
Director, Division of Medical Toxicology