**MICHAEL N. FEUER,** City Attorney (SBN 111529x)
**THOMAS H. PETERS,** Chief Assistant City Attorney
**CORY M. BRENTE,** Supervising Assistant City Attorney
**J. EDWIN RATHBUN,** Deputy City Attorney
**CHRISTIAN BOJORQUEZ**, Deputy City Attorney
**ELIZABETH A. MITCHELL**, Deputy City Attorney (SBN 251139)
200 N. Main Street, 6th Floor, City Hall East
Los Angeles, CA  90012
Email: Elizabeth.Mitchell@lacity.org
Tel:  (213) 978-6900  Fax:  (213) 978-8785

Attorneys for Defendants CITY OF LOS ANGELES, STEVEN BEUMER,
JONATHAN GAN, JOSE A. PEDROZA and JOHN SEFFEL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MEARS, individually and as Successor in Interest to Michael Mears; and JOANNA WYSOCKI, individually and as successor in interest to Michael Mears, <br><br>               Plaintiffs, <br><br>vs. <br><br>CITY OF LOS ANGELES, et al., <br><br>               Defendants. | **Case No.: CV 15-08441 JAK (AJWx)** (Consolidated with Case No. **LA CV15-09587 JAK (AJWx)**) <br>Honorable Judge: John A. Kronstadt <br>Honorable Magistrate Judge: Andrew J. Wistrich <br><br>**DEFENDANTS CITY OF LOS ANGELES, ET AL.'S *AMENDED* MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR MOTION FOR NEW TRIAL** <br><br>**Fed. R. Civ. Pro. 50(b) and 59** <br><br>**Date: March 5, 2018** <br>**Time: 8:30 a.m.** <br>**Crtm: 10 B** |

## TO THIS HONORABLE COURT, PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

Please take notice that on March 5, 2018, at 8:30 a.m. in Courtroom 10B of the United States District Courthouse in Los Angeles, located at 350 W. First Street, Los Angeles, CA  90012, Defendants CITY OF LOS ANGELES,

STEVEN BEUMER, JONATHAN GAN, JOSE A. PEDROZA and JOHN SEFFEL will move for Judgment as a Matter of Law and/or New Trial pursuant to Fed. R. Civ. Pro 50 and 59 for the reasons set forth below.

This motion is based upon this notice, the attached memorandum of points and authorities, the court's records and files as maintained, and any oral and/or documentary evidence produced at or by the time of the hearing.

This motion is set pursuant to the Court order pursuant to the parties' stipulation permitting it to be filed on January 22, 2018 (Doc. 133). The parties met and conferred regarding this motion on January 12, 2018 in compliant with local rule 7-3.

Defendants request that judgment be entered in their favor and/or they receive a new trial on one or more of the following bases:

1. Plaintiffs failed to prove the officers used excessive force on decedent causing his death; alternatively, Defendant Gan is entitled to qualified immunity

2. The Court made evidentiary errors which substantially prejudiced Defendants' case

Dated: January 25, 2018

MICHAEL N. FEUER, City Attorney
THOMAS H. PETERS, Chief Assist. City Attorney
CORY M. BRENTE, Supervng Assist. City Attorney
J. EDWIN RATHBUN, Deputy City Attorney
CHRISTIAN BOJORQUEZ, Deputy City Attorney

By ___/S/ *Elizabeth A. Mitchell*

**Elizabeth A. Mitchell**, Deputy City Attorney
Attorney for Defendants CITY OF LOS ANGELES,
STEVEN BEUMER, JONATHAN GAN, JOSE A.
PEDROZA and JOHN SEFFEL

2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Act Up!/Portland v. Bagley*,
    988 F.2d 868 (9th Cir. 1993) ....................................................................12

*Ames v. King County*,
    846 F.3d. 340 (9th Cir. January 2017)....................................................13

*Anderson v. Creighton*,
    483 U.S. 635, 170 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) .......................11

*Blankenhorn v. City of Orange*,
    435 F.3d 463 (2007)...................................................................................13

*Boeing Co. v. Cascade Corp.*,
    2007 F.3d 1177 (9th Cir. 2000) ................................................................8

*Brigham City, Utah v. Stuart*,
    547 U.S. 398, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) ....................13

*Daniels v. Williams*,
    474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 662 (1986) ...............................7

*Glenn v. Washington County*,
    673 F.3d 864 ...............................................................................................13

*Goldsmith v. Snohomish County*,
    558 F. Supp.2d 1140 (W.D. Wash. 2008) ...................................13, 14

*Graham v. Conner*,
    490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ....................11

*Graham v. County of L.A.*,
    2012 U.S. Dist. LEXIS 100470 (C.D. Cal 2012) ....................................13

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008) ...................................................................8

*Hernandez v. City of Pomona*,
    46 Cal. 4th 501 (2009) ..............................................................................11

*Hunter v. Bryant*,
  502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) ........................................12

*Jackson v. City of Bremerton*,
  268 F.3d 646 (9th Cir. 2001) ........................................13

*Landes Const. Co, Inc. v. Royal Bank of Canada*,
  833 F 2d 1365 (9th Cir. 1987) ........................................6

*Malley v. Briggs*,
  475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) ........................................12

*Melendez-Diaz v. Massachusetts*,
  557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (Mitchell
  Decl., Exhibit 3 ) ........................................5, 17

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ........................................6

*Parratt v. Taylor*,
  451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981) ........................................7

*Pearson v. Callahan*,
  555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ........................................12

*Preschooler II v. Clark Cnty. Sch. Bd. Of Trs.*,
  479 F.3d 1175 (9th Cir. 2007)(a person commits a constitutional
  violation under § 1983 "if he does an affirmative act, participates in
  another's affirmative act or omits to perform an act which he is legally
  required to do…") ........................................7

*Saucier v. Katz*,
  533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ........................................12

*Tatum v. City and County of San Francisco*,
  441 F.3d 1090 (9th Cir. 2006) ........................................13

*Van Ort v. Estate of Stanewich*,
  92 F.3d 831 (9th Cir. 1996) ........................................8

*Wood v. Ostrander*,
  879 F.2d 583 (9th Cir. 1989) ........................................12

*Zhang v. Am. Gem Seafoods, Inc*,
  339 F.3d 1020 (9th Cir. 2003) ........................................6

4

**Statutes**

42 U.S.C. § 1983 .................................................................................7, 11

**Other Authorities**

Fourth Amendment .........................................................................11, 13

Sixth amendment............................................................................17

Fed. R. Civ. P. 59(a)(1)(A) .............................................................6

Fed. R. Evid. 403 ...........................................................................15

Fed. R. Evid. 802 ...........................................................................16

Fed. R. Evid. 803(18)......................................................................16

Fed. R. Evid. §§ 703, 705 ...............................................................17

Rule 50(a) of the Federal Rules of Civil Procedure ........................5

Rule 59 of the Federal Rules of Civil Procedure ............................6

FRCP 50(b) ....................................................................................5, 6

FRCP 59 .........................................................................................6, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs did not prove crucial elements of their case: they did not prove that the Taser (the only 'use of force' which was found to have caused Mr. Mears' death) ever touched decedent, nor did they prove that that Mr. Mears would not have expired but for the officers' actions. Moreover, the underlying material facts in this case were not in dispute and the undisputed evidence points to objectively reasonable actions by defendant officers; alternatively, Defendant Gan is entitled to qualified immunity. Finally, there were critical errors made by the court, namely the introduction of two crucial documents, which inherently and irreparably prejudiced defendants. As such, Defendants herein request a Judgment as a Matter of Law in their favor or, at minimum, a new trial.

## II.   STATEMENT OF FACTS

### a.   Testimony at Trial

The following testimony was provided at trial and was undisputed:

The Los Angeles Fire Department received a call for a medical emergency at decedent Michael Mears' residence, 5730 Centinela Avenue (Alesio Apartment complex), on December 24, 2014 at approximately 8:00 p.m. The first two paramedic/firefighters who arrived at the scene approached Mr. Mears, who was in the third floor hallway of the complex. Mr. Mears was bleeding profusely and thrashing around on broken glass on the floor.  As the firefighters approached, Mr. Mears continued to thrash around the floor and they ultimately did not feel safe attempting to render medical aid to him.  Consequently, they called for additional Fire Department and Los Angeles Police Department ("LAPD") personnel. The firefighters then retreated behind the fire doors in the hallway.

Officers Steve Beumer and Jose Pedroza were the first LAPD officers to arrive at the location. They spoke with the paramedic/firefighters and devised a plan to approach Mr. Mears and attempt to handcuff him, at which point the firefighters would

1

immediately administer a sedative and render medical care.  The three men approached Mr. Mears and waited to see if he would calm down.  For a short period, Mr. Mears stopped moving and thrashing about, at which time the officers and firefighters got closer to him.  Mr. Mears then suddenly became violent again, thrashing, flailing and kicking towards the officers. Officer Beumer withdrew his PR-24 baton and swung it towards Mr. Mears' legs in order to avoid being kicked by Mr. Mears. Officer Beumer then deployed a single 5-second burst of his OC spray, which also had no effect, causing officers and the firefighter to retreat.

      Officers Beumer and Pedroza called for LAPD back-up and a supervisor. The additional resources started to arrive and they all formulated a plan of approach. Officer Lew was assigned as "less lethal bean bag gun" and Officer Gan was assigned to be the Taser officer. Officers Beumer and Pedroza were to attempt physical control and aid in handcuffing. Officers Gist and Seffel were to attempt the handcuffing.  As the team approached Mr. Mears, he was still bloody, thrashing about, and kicking towards the officers.  When Mr. Mears momentarily stopped moving, Officer Gan drew and fired his Taser at Mr. Mears' back.  It is unclear whether the Taser darts lodged in Mr. Mears' back, or whether they merely stuck to his shirt.  Immediately after the Taser was deployed and seeing it had no effect on Mr. Mears, Officers Beumer, Pedroza and Seffel went to the ground and attempted to control Mr. Mears' arms so that he could be handcuffed and immediately receive medical attention.  All three officers applied some body weight on Mr. Mears and Officer Pedroza delivered two hand strikes to Mr. Mears' left shoulder area in order to get Mr. Mears' hands out from under his body.

      Mr. Mears continued to attempt to move around and failed to place his arms behind his back.  Seeing this and believing that the Taser had no effect on Mr. Mears, Officer Gan activated the Taser five more times, for a total of six activations over a period of approximately three minutes.  Officer Gan was clear that he reassessed the situation after each Taser activation and before the next activation. One activation lasted approximately 32 seconds; Officer Gan testified he was unaware that the automatic 5-

second shutoff was overridden. It is undisputed that he did not activate the Taser after Mr. Mears was handcuffed.  Immediately after Mr. Mears was handcuffed, the paramedics who were standing by administered a sedative to Mr. Mears, placed him on a gurney and transported him to UCLA Medical Center.  Firefighter/paramedic Thomas Desteuben rode in the back of the ambulance to the hospital with Mr. Mears and testified that at no time prior to arriving at the hospital did Mr. Mears' heart stop beating, nor did he stop breathing.

Sgt. Adam Loo testified as the Defendants' expert witness as to all uses of force by the individual Defendants except for the use of the Taser.  Sgt. Loo opined that Defendant Beumer's use of the PR-24 and deployment of OC spray, Defendant Pedroza's use of body weight on, and hand strikes to, Mr. Mears and Defendant Seffel's use of body weight on Mr. Mears were all objectively reasonable and appropriate. Unsurprisingly, Roger Clark testified on behalf of Plaintiff and opined that every decision made and every use of force by every officer was excessive and inappropriate. Sgt. Mike Hall testified as the Defendants' expert witness as to the use of the Taser on Mr. Mears by Defendant Gan.  Sgt. Hall opined that Defendant Gan's use of the Taser was objectively reasonable and appropriate.

Once Mr. Mears arrived at UCLA at 9:04 p.m., he was treated immediately. The initial impression was a drug overdose and that he was in a state of excited delirium. Approximately 45 minutes after arriving at UCLA he had his first of three heart attacks. Mr. Mears remained at UCLA until early (6:32 a.m.) on December 26, 2014 when he expired from another heart attack.  According to the autopsy, the cause of decedent's death was ventricular dysrhythmia as a consequence of cardiac enlargement with biventricular hypertrophy and four chamber dilation. The Coroner noted cocaine intoxication and police restraint with use of taser as conditions which were contributing but NOT related to the immediate cause of death.

Dr. Hiserodt was the only medical expert called by Plaintiffs who notably had no experience with the Taser other than what he had seen on TV.  He did not know the

chronological chain of events surrounding the uses of force, and was unaware of the manner in which the Taser was used on Mr. Mears (Drive Stun vs. Probe mode). He also admitted that typically if a Taser was used, one would find small round burn marks where the electrical current damaged the skin; no such areas were noted at the autopsy nor did photographs show anything similar. The crux of his opinion was that the struggle with the officers, including the baton strikes, OC spray, tasing, punches, and prone restraint, all combined to increase Mr. Mears' muscle activity which caused lactic acidosis, hyperkalemia (high potassium levels), hypoglycemia (low blood sugar), low glucose, and low ph which combined caused him to suffer a cardiac arrest.

Defendants called three (3) medical experts: Dr. Charles Wetli (forensic pathologist), Dr. Richard Clark (emergency room doctor specializing in toxicology), and Dr. Gary Vilke (professor of clinical medicine, specializing in Taser effects on individuals). Dr. Vilke testified that decedent's potassium levels in his blood were so high, he would have eventually died from a cardiac arrest regardless of his interaction with law enforcement. He further testified that Plaintiff's theory of Positional Restraint asphyxia – the theory that placing an individual prone while handcuffed interferes with their ability to breath – has been debunked by numerous studies. Given that Mr. Mears was moving and verbalizing during the incident, including on the way to the hospital and was continuously struggling with officers, he could clearly breathe throughout the incident. Finally, Dr. Vilke testified there is no published literature demonstrating that Taser applications can contribute to sudden cardiac arrest. If the Taser had been a causative factor, decedent's heart would have gone into ventricular fibrillation at the time the electricity was being delivered, causing him to immediately lose consciousness which did not occur.

Dr. Wetli opined that Mr. Mears had the typical signs of excited delirium given his bizarre behavior at the scene and medical complications at the hospital (lactic acidosis, drop in blood Ph, sever hyperkalemia [high potassium levels], rhabodmyolysis [breakdown of muscle tissue causing kidney failure], and multiorgan failure).  Dr. Wetli

explained that individuals with excited delirium typically have heightened strength and endurance and are impervious to pain. Excited delirium eventually results in death through kidney failure and hyperkalemia.

Dr. Clark testified that Mr. Mears was under the influence of cocaine at the time of the incident (based on his toxicology result) which explains his bizarre behavior. He also testified regarding the extreme acidosis and elevated potassium levels in his blood which explain his death unrelated to police activity.

### a. Evidentiary Discussions

The two documents that were admitted into evidence over Defendants' objections which are the subject of this motion are the Autopsy Report (Exhibit 119) and the 2013 Taser Warning (Exhibit 48). Defendants objected to Exhibit 48 being introduced into evidence on the basis that there was no foundation laid for the document and it contained numerous hearsay statements. The Court found there was "testimony from Sergeant Hall on [the document]" and "it goes to…the failure-to-train cause of action." (Mitchell Decl., Exhibit 2, Evidentiary Hearing Nov. 9, p. 16:9-19.) No foundation was ever laid regarding whether officers were trained on it or even should have been trained on it [*Id at* 17, 18]. Defendants initially stipulated to the entire autopsy report being admitted into evidence during Dr. Hiserodt's testimony but subsequently withdrew that stipulation and requested that it be removed from evidence (Mitchell Decl., Exhibit 3, Nov. 13 transcript, p. 2:6-13). Mr. Bojorquez argued that was a prejudicial effect given that the Taser warning was admitted and that the combined effect was incurably prejudicial to defendants. (*Id* at p. 5:7-23)  He also noted that it was hearsay and should not come in under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (Mitchell Decl., Exhibit 3 at 6:2-4). The court ultimately admitted it because it didn't find the 403 argument persuasive and "the case was tried based on the understanding" that it was coming in so "it should be admitted and not changed at the last minute." (*Id* at 11:18-23).

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   LEGAL STANDARDS

### A.   Judgment as a Matter of Law (FRCP 50(b))

Rule 50(a) of the Federal Rules of Civil Procedure provides that once a "party has been fully heard on an issue" the court may determine the issue as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Additionally, Rule 50(b) provides that a party may renew its previous Motion for Judgment as a Matter of Law in the event the party properly raised said motion during trial which the Court denied. Fed. R. Civ. Pro. 50(b). As Defendants properly raised said motion during trial, Defendants renew their motion herein.

### B.   Motion for New Trial (FRCP 59)

Rule 59 of the Federal Rules of Civil Procedure provides in pertinent part that a motion for new trial may be granted "for any of the reasons for which a new trial has heretofore been granted in an action at law in federal court. . ." Fed. R. Civ. P. 59(a)(1)(A).  Rule 59 does not specify the grounds on which a motion for a new trial may be granted.  *Zhang v. Am. Gem Seafoods, Inc*, 339 F.3d 1020, 1035 (9th Cir.  2003). Rather, the court is "bound by those grounds that have been historically recognized."  *Id*. "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007)(quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  The *Molski* Court noted further:

> [T]he district court has 'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.' Id (citations omitted).

In ruling on a motion for new trial, the Court may weigh evidence and there is no need to view the evidence in the light most favorable to the verdict. *Landes Const. Co, Inc. v. Royal Bank of Canada*, 833 F 2d 1365, 1371 (9th Cir. 1987).

## IV.   PLAINTIFFS FAILED TO PROVE THE OFFICERS USED EXCESSIVE FORCE ON DECEDENT CAUSING HIS DEATH; ALTERNATIVELY, DEFENDANT GAN IS ENTITLED TO QUALIFIED IMMUNITY ON THE FEDERAL CLAIMS

### a.  There Was Insufficient Evidence Officers' Use of Force Caused Mr. Mears' Death

The jury unanimously rejected the contention that any of the non-Taser officers' use of force caused Mr. Mears harm, necessarily rejecting Plaintiff's "group activity" theory [Mitchell Decl., Exhibit 4, Verdict Form, Question 2]. Thus the only use of force remaining that could have arguably caused decedent's death was the Taser and there is no evidence that the Taser darts or the electricity therefrom even touched Mr. Mears. Decedent's behavior at the scene gave no indication that the Taser was working and there was no evidence of Taser-related burns or puncture wounds on his body during the autopsy, conforming the officers' observations. For all anybody knows, the darts could have stuck into his clothing and never reached Mr. Mears' body at all.  On this basis alone, the Court should find in Defendants' favor on the excessive force issue.

Even if, arguendo, Plaintiff did prove that the Taser did work on Mr. Mears as it was intended to do, Defendants would still submit the overall Tasing was reasonable: Officer Gan stopped and reassessed between each application and only re-applied the Taser when it appeared objectively reasonable to try to attempt to take Mr. Mears into custody.  Even if the one 32-second cycle was found to be objectively unreasonable, it is beyond dispute that was a mistake on Officer Gan's part because he believed the Taser would automatically shut off after 5 seconds. If anything, that is negligence on his part, not affirmative conduct, which cannot be the basis for §1983 liability. *Daniels v. Williams,* 474 U.S. 327, 333, 106 S. Ct. 662, 88 L. Ed. 662 (1986)("Where a government official's act causing injury to life, liberty, or property is merely negligent, no procedure for compensation is constitutionally required."(citing Justice Powell's concurring opinion in *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981);

*Preschooler II v. Clark Cnty. Sch. Bd. Of Trs.,* 479 F.3d 1175, 1183 (9th Cir. 2007)(a person commits a constitutional violation under § 1983 "if he does an affirmative act, participates in another's affirmative act or omits to perform an act which he is legally required to do…")

Even if this Court finds that the jury's verdict on use of force stands, Plaintiffs still failed to prove that the use of force was the "actionable cause" of Mr. Mears' death. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). To meet the "actionable cause" requirement, "the plaintiff must establish both causation-in-fact and proximate causation." *Ibid*. "Causation-in-fact" is often referred to as "but-for" causation meaning. *See e.g. Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) In other words, the harm would not have occurred but for defendant's conduct; also known as "*sine qua non"* ("without which not") causation. *Boeing Co. v. Cascade Corp.,* 2007 F.3d 1177, 1183 (9th Cir. 2000).

The undisputed evidence shows Mr. Mears was still alive and kicking (literally) throughout the entire encounter with the police and in the ambulance on the way to the hospital. It wasn't until 45-minutes after arriving at the hospital (roughly an hour after the use of force) that he had his first heart attack, which did not cause him to immediately expire. He remained at UCLA for another two (2) days until he had a final heart attack and sadly passed away.  At trial Plaintiff did not call the coroner who examined his body, but only called Dr. Hiserodt who had no experience with the Taser. The sum and substance of Dr. Hiserodt's testimony was that the totality of Mr. Mears' encounter with the officers – the struggle on the ground, the baton use, the OC spray, the prone restraints, and the taser – caused increased muscle activity which resulted in various blood chemistry changes such as lactic acidosis, hyperkalemia, hypoglycemia, and low ph which ultimately caused him to go into cardiac arrest. (Mitchell Decl., Exhibit 1, pp. 13-15).

Interestingly, that contention was categorically rejected by the jury, who found only Officer Gan's use of force (Taser) was a substantial factor in causing Mr. Mears'

death. (Mitchell Decl., Exhibit 4, Question 2).  Yet Dr. Hiserodt gave no opinion about the Taser on its own causing death, but merely opined it was the totality of the struggle that caused his unfortunate demise.[1]  The jury's conclusion aside, however, Plaintiff simply failed to prove "but for" the struggle with the officers Mr. Mears would not have passed away. In reviewing Dr. Hiserodt's testimony (the only "causation" witness presented by Plaintiff), Dr. Hiserodt did give the ultimate opinion that the interaction with the officers caused Mr Mears' death, but he could not explain why Mr. Mears would not have died "but for" the officers' arrival. When asked why he opined that Mr. Mears would not have died without the officers' actions, his only answer is "Because the cause of death is intimately related…with the metabolic changes that occurred during all of the restraint processes that we've discussed…"(Mitchell Decl., Exhibit 1, 30:6-8). In other words, Dr. Hiserodt opined that Mr. Mears would not have died but for officers' actions because the officers' actions caused his death. Or, to put it more simply: "It is because I say it is."  That statement wholly lacks foundation and cannot be considered to have true evidentiary value. Dr. Hiserodt never addressed Mears' drug consumption and actions before officers were on the scene which necessitated their arrival in the first place.  Further Dr. Hiserodt admitted Mr. Mears had cocaine in his system which can cause Excited Delirium, that Excited Delirium can manifest itself in a person being agitated, excited, aggressive, resistant to painful stimuli, nonresponsive to commands, talking in coherently, and bizarre behavior (*Id* 44:6-45:2) (all of which decedent clearly exhibited) and that excited delirium can cause changes in the blood associated with muscular movement and breakdown including rhabdomyolysis, hyperkalemia and lactic acidosis (*Id* 45:2-47:19). It is undisputed these changes in the blood are what ultimately caused his death.

Mr. Mears was clearly under the influence of narcotics, acting erratically and violently, breaking glass and rolling around it in (demonstrating his imperviousness to

---

[1] The only piece of evidence directly linking Taser use alone with death was the Taser Warning (Exhibit 48), discussed in further detail *infra* Part V.

pain and lack of rational thought); this increased muscle activity (not to mention demonstrable intent/willingness to harm himself) could easily have lead to the same outcome without police interference. Drs. Clark, Vilke, and Wetli all testified as much, and Dr. Hiserodt concurred on all the signs and symptoms of cocaine-induced excited delirium and failed to explain his opinion that Mr. Mears would not have died without police interference. Thus, even if Plaintiff could show that excessive force was used, he still did not and cannot show that "but for" the officer' actions, Mr. Mears would be alive today.

> **b.    There Was No Constitutional Violation, or At Least Officers Are
>          Entitled to Qualified Immunity**

The material underlying facts are not in contention. Both sides agree that Mr. Mears was acting erratically and violently, was rolling around in glass that he broke, and was bleeding profusely from several places on his body.  There is no question that LAPD officers – once summoned to the scene by LAFD personnel who could not handle the situation – had to act quickly to get Mr. Mears under control so he could be treated and before he could further harm himself or someone else. Nor is there any debate about the force that was used to subdue him: two baton strikes, OC spray two distraction strikes to attempt to handcuff him, then activation of the Taser six (6) times for a total of 53 seconds, one of which lasted for 32 seconds.  There was no evidence presented by either side that any officers had any reason to suspect the Taser activations had any real effect on Mr. Mears: he never stopped his erratic activity, he never verbalized or screamed out in pain, he never even exhibited the neuromuscular incapacitation that officers are trained will occur if the Taser is effectively used. In fact, as we sit here today, looking back with 20/20 hindsight, there is STILL no evidence that the Taser ever affected Mr. Mears: no puncture wounds or burn-like abrasions consistent with being tased were found on his body which even Plaintiff's experts admit would have been found if the decedent was tased.  Because there is no material dispute of fact, it is the

Court's duty to determine whether such facts add up to an excessive use of force in violation of the Fourth Amendment.

A private cause of action exists against police officers who, acting under color of state law, violate federal constitutional or statutory rights. 42 U.S.C. § 1983. Fourth Amendment excessive force claims are evaluated under a standard of "objective reasonableness." *Graham v. Conner,* 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

> Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake…. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.
>
> *Id.* at 396 (citations omitted).

 "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The inquiry is one of "objective reasonableness" under the circumstances, and the officer's motivations or evil intentions have no place in that in that inquiry. *See id.* at 399. California courts judge claims of negligent use of force by the same standards as they would use to evaluate whether there was a Fourth Amendment violation. *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 511-14 (2009).

Even if the Court finds excessive force was used, qualified immunity protects individual defendants from liability for civil damages when performing discretionary functions, unless such conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 640, 170 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). It is established that qualified

immunity is not simply a defense available to public officials in lawsuits arising from the discharge of their official duties. Rather, it operates as a bar on liability -- an immunity from suit -- that attaches whenever a public official reasonably could have believed that his or her conduct was lawful in light of clearly established law.  *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir. 1993).

   In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) the Court explained that qualified immunity involves a two-step inquiry that the plaintiff must overcome: First, the Court determines whether the facts as the plaintiff alleges constitute a violation of the plaintiff's rights. If the answer is yes, the Court must then inquire whether the defendant could nonetheless have reasonably but erroneously believed that his conduct did not violate the plaintiff's rights. *Cf Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)(clarifying that while the "*Saucier* sequence is often appropriate, it [is not] mandatory" and that either of the two prongs may be decided first).

   The second inquiry must be taken "in light of the specific context of the case, not as a general broad proposition." *Saucier v. Katz*, *supra* at 201. Keeping in mind that qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986), the Court cautioned that "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz, supra,* at 202. If Plaintiff fails to satisfy either element, judgment must be granted as a matter of law in favor of Defendants. *Ibid.*  In sum, the doctrine of qualified immunity protects a police officer from federal civil rights liability if a reasonable officer could have believed that his/her actions were constitutional, even if they were not. *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989).

   In this case Plaintiffs simply did not prove that excessive force was used; each use of force was objectively reasonable given the emergency situation the officers were

facing. The officers were rendering emergency aid for the protection of Mr. Mears and the firefighters who were attempting to give medical attention and asked police to assist. Under such a scenario, the nature of the intrusion is *de minimus* compared to the compelling interests in rendering aid and protection of public safety personnel. *See*, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006).  Though the "community caretaking" or "emergency doctrine" exception to the Fourth Amendment typically arises in the context of warrantless searches, courts in this circuit have extended the doctrine to detentions for medical aid as well.  See, e.g. *Graham v. County of L.A.,* 2012 U.S. Dist. LEXIS 100470 at *13 (C.D. Cal 2012) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") The ninth circuit has found each of the types of uses of force involved in this case objectively reasonable in various similar situations. *See Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095-1100 (9th Cir. 2006)(reasonable to use a group take-down method and to hold individual, who was high on cocaine, prone on the ground handcuffed at which point he died); *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001)(spraying plaintiff with OC spray, pushing to ground to handcuff, placing her in hot car was not excessive); *Blankenhorn v. City of Orange*, 435 F.3d 463 (2007)("Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force."); *Glenn v. Washington County*, 673 F.3d 864, 877 (9th Cir. 2011 (noting advantages of taser over beanbag shotgun which is more intrusive); *Graham v. County of Los Angeles*, *supra* (repeated tasing of patient fighting firefighters not a constitutional violation); *Ames v. King County*, 846 F.3d. 340 (9th Cir. January 2017)(deputies entitled to qualified immunity for use of force on a third party because actions objectively reasonable in light of urgent need to deliver life-saving care and ensure safety of everyone at scene); *Goldsmith v. Snohomish County*, 558 F. Supp.2d 1140, 1150-51 (W.D. Wash. 2008)(finding "the escalating use of force was proportionate to and required by the situation facing the deputies" where man assaulted paramedics, was covered in blood, incoherent, sweaty, and violent causing

deputies to use punches, O.C. spray, hobble, bodyweight, and taser to ultimately attempt
to subdue him).  Similar to *Goldsmith*, defendant officers started with minimal force and
escalated that force in proportion to the situation facing them, ultimately requiring
significant resources to take Mr. Mears' into custody.  Given the need to provide
immediate medical treatment, and the use of force that appeared necessary to get Mr.
Mears that treatment, defendant officers' actions were objectively reasonable and the
court should so-find. At a minimum Defendant Gan should be granted qualified
immunity for his actions.

## V.   EVIDENTIARY ISSUES

As discussed *supra*, the Court allowed two (2) documents into evidence over
Defendants' objections: the autopsy report (Exhibit 119), attached to Mitchell
Declaration as Exhibit 5, and the 2013 Taser Warning (Exhibit 48), attached to Mitchell
Declaration as Exhibit 6. Originally Defendants themselves requested the autopsy be
moved into evidence during the testimony of Dr. Hiserodt. There was some language
that was prejudicial to Defendants but ultimately in order to effectively cross-examine
Dr. Hiserodt, Defendants felt it was important to examine the details underlying his
opinion. However, once the Court ruled the 2013 Taser Warning could come into
evidence, Defendants immediately requested to withdraw the autopsy report from
evidence because they recognized the extreme prejudicial effect introducing both
documents into evidence would have. Without the ability to confront and cross-examine
the authors of the documents in order to determine the bases for the statements made
therein, Defendants were unable to evaluate and/or discredit the statements.  The
combined effect of the two documents ultimately prejudiced Defendants in a meaningful
and profound way (as clearly evidenced by the jury verdict form).

There was no testimony regarding where the 2013 Taser Warning came from,
whether the warning was presented to officers during training or even should have been
presented to officers during training such that it would be relevant to Plaintiffs' "failure
to train" theory. There was testimony that Exhibit 52 was the documents used to train

LAPD officers – not Exhibit 48. No witness testified that Exhibit 48 "should have been" used or that officers should have seen it.  Sgt. Mike Hall may have *recognized* the document, but that is insufficient to lay foundation. Nor is there evidence that this particular warning was even the one in effect at the time. The Court allowed it into evidence ultimately as relevant to Plaintiffs' "failure-to-train" theory[2] but given the tangential relation to the case, its relevance is limited at best. Moreover, under Fed. R. Evid. 403, "relevance" must be weighed against the prejudicial effect which here was quite significant.  In any case, there still must be sufficient foundation laid for the document, and improper hearsay is not permitted no matter how relevant the document may be.

Specifically, the following statements in the 2013 Taser Warning were extraordinarily prejudicial to Defendants, particularly without the ability to cross-examine the declarant and determine what medical/scientific basis (if any) was provided for these statements:

Page 1-2:    **Cumulative Effects**.  CEW [Taser] exposure causes certain effects, including physiologic and metabolic changes, stress, and pain.  In some individuals, the risk of death or seirous injury may increase with cumulative CEW exposure.  Repeated, prolonged, or continuous CEW applications may contribute to cumulative exhaustion, stress, cardiac, physiologic, metabolic, respiratory, and

---

[2] To this end, if the Court determined there was sufficient foundation for this document, it did not contain improper hearsay and was relevant to only the "failure to train" theory, Defendants submit their prior request to bifurcate the "Monell" issue from the "liability" issue should have been granted and it was error not to do so. There was no reason why, at that point, the issues could not have been bifurcated, preventing this prejudicial document from being presented to the jury during the liability phase.  As noted in fn.1, *supra*, this document was the only one which referenced the Taser alone as being possible of causing death.  The jury, in finding that only the Taser officer (Gan, who used no other force) caused decedent's death, clearly had to have based its decision on this document; no other "causation" evidence linking the Taser by itself with possibility of death was introduced. Alternatively, had the court submitted a limiting instruction telling the jury to evaluate the Warning ONLY for *Monell* purposes, perhaps the prejudice to Defendants could have been minimized.  Unfortunately this was not done.

associated medical risks which could increase the risk of death or serious injury. Minimize repeated, continuous, or simultaneous exposures.

Page 2:        **Physiologic and Metabolic Effects**  CEW use causes physiologic and/or metabolic effects that may increase the risk of death or serious injury. These effects include changes in blood chemistry, blood pressure, respiration, heart rate and rhythm, and adrenaline and stress hormones, among others. [¶]

Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include the elderly, those with heart conditions, asthma or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle.  In a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death.

These statements contain medical and scientific opinions without source or foundation cited. They are the definition of out-of-court statements which are being offered for the truth of the matter in direct violation of Fed. R. Evid. 802. To the extent Plaintiff argues it was offered under their "failure to train" theory, it is still hearsay because truth of the statements made therein is central – if the statements weren't true, they wouldn't affect whether or not officers should have been trained in this manner.  It cannot fall under the "business record" exception (803(6)) because no one testified to its creation and it is not a "compilation" similar to a market report under 803(17). This warning certainly is no "learned treatise, periodical or pamphlet" under 803(18) because it is not "written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake" such as an academic text [Fed. R. Evid. 803(18), Adv. Comm. Notes] (plus was actually admitted into evidence as an exhibit which is explicitly prohibited). No witness, not even Roger Clark, testified he relied on the document in forming the basis for his opinion. The reality is these types of "warnings" often contain statements without any, or at least any significant, scientific or medical basis but are included to protect the company against future litigation.  But we will never know, because the author of the warning was not called to lay the foundation or explain the basis for these statements.

The second document in question is the autopsy report (Exhibit 119) and, as discussed *supra*, the stipulation to admit was withdrawn by Defendants once the Taser Warning was introduced. Specifically, the prejudicial statements made in the autopsy report are the statements under "other conditions contributing but not related to the immediate cause of death" where it lists "police restraint with use of taser." (Mitchell Decl., Exhibit 5) and on the last page (p. 14) reiterating that "Police Restraint with Use of Taser" was a "significant condition."

In addition to the prejudicial effect of this document, it contains rampant hearsay. The experts may have relied on the autopsy report in forming their conclusions, and it would certainly be proper for the bases for the opinions to be revealed, but that does not mean the entire report itself is admissible under Fed. R. Evid. §§ 703, 705. No affidavit was filed, nor was there testimony by a custodian of records, allowing for it to be admitted under 803(6) or (8). Importantly, the seminal case of *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) highlights the prejudicial effect these types of documents have when introduced without testimony by the author. Referring to a toxicology report, which was admitted during trial as a public/business record, the Supreme Court found that the introduction thereof violated Melendez-Diaz' sixth amendment right to confront witnesses against him. *See id* at 317 (citing *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) for holding the confrontation clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.") True, the confrontation clause is only applicable to criminal cases, but the same theory applies here: defendants stand accused of serious offenses and plaintiff has the burden to prove those allegations. Without the ability to cross-examine the author regarding the bases of the findings, including the meaning of certain terms of art contained in the report that would not be known to a lay jury (such as the meaning of "contributing but not related to the immediate cause of death"), defendants were

inherently prejudiced because statements made in the document could be simply be taken as fact.

The combined effect of these two documents on the jury was incurably destructive to defendants' case: a coroner (who the jury never heard from but it's official-sounding so inherently believable) found that the Taser contributed to Mr. Mears' death, and an official-looking document put out by Taser, International itself warns that repeated use of a Taser can cause death. Right there, Plaintiff's "causation" case is made without having to prove any of it and without Defendants having the opportunity to challenge it. We know this is what happened because the jury ultimately ONLY found the Taser operator used excessive force causing Mr. Mears' death and there was NO testimony by ANY witness that a Taser could or would, on its own, cause such an effect. The only evidence in front of the jury that drew such a conclusion were these documents. To make matters worse, the Court did not come to any conclusions about the admissibility of this evidence until AFTER closing arguments preventing Defendants from being able address the significant problems with the document during argument. The combined effect was inherently and ultimately hopelessly prejudicial to defendants.

## VI. CONCLUSION

For all the reasons discussed herein, Defendants respectfully request the Court grant Defendants Judgment as a Matter of Law, insofar as Plaintiffs failed to prove the Taser ever even touched or affected Mr. Mears, and they failed to prove that the officers'

///

///

///

///

///

///

///

actions were both the proximate cause and cause-in-fact of Mr. Mears' death. Alternatively, Defendants request a New Trial under Fed. R. Civ. Pro. 59, particularly given the prejudicial admission of Exhibits 119 and 48.

Dated: January 25, 2018         MICHAEL N. FEUER, City Attorney
                                THOMAS H, PETERS, Chief Assist. City Attorney
                                CORY M. BRENTE, Supervng Assist. City Attorney
                                J. EDWIN RATHBUN, Deputy City Attorney
                                CHRISTIAN BOJORQUEZ, Deputy City Attorney

                                By:   /S/ *Elizabeth A. Mitchell*

                                **Elizabeth A. Mitchell**, Deputy City Attorney
                                Attorneys for Defendants Attorney for Defendants CITY OF LOS ANGELES, STEVEN BEUMER, JONATHAN GAN, JOSE A. PEDROZA and JOHN SEFFEL

## <u>DECLARATION OF ELIZABETH MITCHELL</u>

I, ELIZABETH MITCHELL, say and declare as follows:

1.       I am a deputy city attorney and one of the attorneys of record for all the defendants herein.  I am duly admitted to practice before this Court.  I make this declaration of my own personal knowledge and could and would so testify if called.

2.       I met and conferred with Melanie Partow, counsel for Plaintiffs, on January 12, 2018

3.       Attached hereto as Exhibit 1 is a true and accurate copy of the transcript we received of Dr. Hiserodt's testimony in the above-captioned trial

4.       Attached hereto as Exhibit 2 is a true and accurate copy of the transcript we received of the evidentiary hearing dated November 9, 2017 in the above-captioned trial

5.       Attached hereto as Exhibit 3 is a true and accurate copy of the transcript we received of the evidentiary hearing dated November 13, 2017

6.       Attached hereto as Exhibit 4 is a true and accurate copy of the verdict form filed in this case, Docket No. 126 [foreperson name redacted]

7.       Attached hereto as Exhibit 5 is a true and accurate copy of the autopsy report, which was admitted into evidence in the above-captioned trial as Exhibit 119

8.       Attached hereto as Exhibit 6 is a true and accurate copy of the 2013 Taser Warning, which was admitted into evidence in the above-captioned trial as Exhibit 48

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 22nd day of January, 2018 at Los Angeles, California.


 /s/ *Elizabeth A. Mitchell*
Elizabeth A. Mitchell, Declarant

## **DECLARATION OF J. EDWIN RATHBUN JR.**

I, J. Edwin Rathbun Jr., declare as follows:

1.      I am an attorney and am licensed to practice law in the State of California and in the United States District Court for the Central District of California. I am the Deputy City Attorney for the City of Los Angeles assigned to handle the litigation in this case on behalf of Defendants City of Los Angeles, Steven Beumer, Jose Pedroza, Jonathan Gan, John Seffel and Andrey Wilkins ("Defendants").  I was co-lead trial counsel in the above-entitled matter and conducted the direct examinations of each of the aforementioned individual Defendants at trial.  The following summary of trial testimony is based on my good-faith belief and recollection of the testimony during trial. To the extent my memory differs from the transcript, if any, in the underlying manner, the transcript is more accurate

2.      The Los Angeles Fire Department received a call for a medical emergency at decedent Michael Mears' residence, 5730 Centinela Avenue (Alesio Apartment complex), on December 24, 2014 at approximately 8:00 p.m. The first two paramedic/firefighters who arrived at the scene approached Mr. Mears, who was in the third floor hallway of the complex. Mr. Mears was bleeding profusely and thrashing around on broken glass on the floor.  As the firefighters approached, Mr. Mears continued to thrash around the floor and they ultimately did not feel safe attempting to render medical aid to him.  Consequently, they called for additional Fire Department and Los Angeles Police Department ("LAPD") personnel. The firefighters then retreated behind the fire doors in the hallway.

3.      Officers Steve Beumer and Jose Pedroza were the first LAPD officers to arrive at the location. They spoke with the paramedic/firefighters and devised a plan to approach Mr. Mears and attempt to handcuff him, at which point the firefighters would immediately administer a sedative and render medical care.  The three men approached Mr. Mears and waited to see if he would calm down.  For a short period, Mr. Mears stopped moving and thrashing about, at which time the officers and firefighters got

closer to him.  Mr. Mears then suddenly became violent again, thrashing, flailing and kicking towards the officers. Officer Beumer withdrew his PR-24 baton and swung it towards Mr. Mears' legs in order to avoid being kicked by Mr. Mears. Officer Beumer then deployed a single 5-second burst of his OC spray, which also had no effect, causing officers and the firefighter to retreat.

       4.      Officers Beumer and Pedroza called for LAPD back-up and a supervisor. The additional resources started to arrive and they all formulated a plan of approach. Officer Lew was assigned as "less lethal bean bag gun" and Officer Gan was assigned to be the Taser officer. Officers Beumer and Pedroza were to attempt physical control and aid in handcuffing. Officers Gist and Seffel were to attempt the handcuffing.  As the team approached Mr. Mears, he was still bloody, thrashing about, and kicking towards the officers.  When Mr. Mears momentarily stopped moving, Officer Gan drew and fired his Taser at Mr. Mears' back.  It is unclear whether the Taser darts lodged in Mr. Mears' back, or whether they merely stuck to his shirt.  Immediately after the Taser was deployed and seeing it had no effect on Mr. Mears, Officers Beumer, Pedroza and Seffel went to the ground and attempted to control Mr. Mears' arms so that he could be handcuffed and immediately receive medical attention.  All three officers applied some body weight on Mr. Mears and Officer Pedroza delivered two hand strikes to Mr. Mears' left shoulder area in order to get Mr. Mears' hands out from under his body.

       5.      Mr. Mears continued to attempt to move around and failed to place his arms behind his back.  Seeing this and believing that the Taser had no effect on Mr. Mears, Officer Gan activated the Taser five more times, for a total of six activations over a period of approximately three minutes.  Officer Gan was clear that he reassessed the situation after each Taser activation and before the next activation. One activation lasted approximately 32 seconds; Officer Gan testified he was unaware that the automatic 5-second shutoff was overridden. It is undisputed that he did not activate the Taser after Mr. Mears was handcuffed.  Immediately after Mr. Mears was handcuffed, the paramedics who were standing by administered a sedative to Mr. Mears, placed him on a

gurney and transported him to UCLA Medical Center.  Firefighter/paramedic Thomas Desteuben rode in the back of the ambulance to the hospital with Mr. Mears and testified that at no time prior to arriving at the hospital did Mr. Mears' heart stop beating, nor did he stop breathing.

6.      Sgt. Adam Loo testified as the Defendants' expert witness as to all uses of force by the individual Defendants except for the use of the Taser.  Sgt. Loo opined that Defendant Beumer's use of the PR-24 and deployment of OC spray, Defendant Pedroza's use of body weight on, and hand strikes to, Mr. Mears and Defendant Seffel's use of body weight on Mr. Mears were all objectively reasonable and appropriate. Unsurprisingly, Roger Clark testified on behalf of Plaintiff and opined that every decision made and every use of force by every officer was excessive and inappropriate. Sgt. Mike Hall testified as the Defendants' expert witness as to the use of the Taser on Mr. Mears by Defendant Gan.  Sgt. Hall opined that Defendant Gan's use of the Taser was objectively reasonable and appropriate.

7.      Once Mr. Mears arrived at UCLA at 9:04 p.m., he was treated immediately. The initial impression was a drug overdose and that he was in a state of excited delirium. Approximately 45 minutes after arriving at UCLA he had his first of three heart attacks. Mr. Mears remained at UCLA until early (6:32 a.m.) on December 26, 2014 when he expired from another heart attack.  According to the autopsy, the cause of decedent's death was ventricular dysrhythmia as a consequence of cardiac enlargement with biventricular hypertrophy and four chamber dilation. The Coroner noted cocaine intoxication and police restraint with use of taser as conditions which were contributing but NOT related to the immediate cause of death.

8.      Dr. Hiserodt was the only medical expert called by Plaintiffs who notably had no experience with the Taser other than what he had seen on TV.  He did not know the chronological chain of events surrounding the uses of force, and was unaware of the manner in which the Taser was used on Mr. Mears (Drive Stun vs. Probe mode). He also admitted that typically if a Taser was used, one would find small round burn marks

where the electrical current damaged the skin; no such areas were noted at the autopsy nor did photographs show anything similar. The crux of his opinion was that the struggle with the officers, including the baton strikes, OC spray, tasing, punches, and prone restraint, all combined to increase Mr. Mears' muscle activity which caused lactic acidosis, hyperkalemia (high potassium levels), hypoglycemia (low blood sugar), low glucose, and low ph which combined caused him to suffer a cardiac arrest.

9.     Defendants called three (3) medical experts: Dr. Charles Wetli (forensic pathologist), Dr. Richard Clark (emergency room doctor specializing in toxicology), and Dr. Gary Vilke (professor of clinical medicine, specializing in Taser effects on individuals). Dr. Vilke testified that decedent's potassium levels in his blood were so high, he would have eventually died from a cardiac arrest regardless of his interaction with law enforcement. He further testified that Plaintiff's theory of Positional Restraint asphyxia – the theory that placing an individual prone while handcuffed interferes with their ability to breath – has been debunked by numerous studies. Given that Mr. Mears was moving and verbalizing during the incident, including on the way to the hospital and was continuously struggling with officers, he could clearly breathe throughout the incident. Finally, Dr. Vilke testified there is no published literature demonstrating that Taser applications can contribute to sudden cardiac arrest. If the Taser had been a causative factor, decedent's heart would have gone into ventricular fibrillation at the time the electricity was being delivered, causing him to immediately lose consciousness which did not occur.

10.     Dr. Wetli opined that Mr. Mears had the typical signs of excited delirium given his bizarre behavior at the scene and medical complications at the hospital (lactic acidosis, drop in blood Ph, sever hyperkalemia [high potassium levels], rhabodmyolysis [breakdown of muscle tissue causing kidney failure], and multiorgan failure).  Dr. Wetli explained that individuals with excited delirium typically have heightened strength and endurance and are impervious to pain. Excited delirium eventually results in death through kidney failure and hyperkalemia.

11.     Dr. Clark testified that Mr. Mears was under the influence of cocaine at the time of the incident (based on his toxicology result) which explains his bizarre behavior. He also testified regarding the extreme acidosis and elevated potassium levels in his blood which explain his death unrelated to police activity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my ability and recollection.  Executed on January 22, 2017 at Los Angeles, California.

/S/ *J. Edwin Rathbun, Jr.*

J. EDWIN RATHBUN JR., Declaration